THE CHASE MANHATTAN
BANK, Plaintiff,

v.

MOTOROLA, INC., Defendant.

No. 00 CIV 4838 AKH.

United States District Court,
S.D. New York.

March 29, 2001.

Barry R. Ostrager, David J. Woll, Mary Kay Vyskocil, Michelle A. Kisloff, Simpson, Thacher & Bartlett, New York City, for Plaintiff.

Joseph Serino, Jr., Kimberly Ziev Niehaus, Kirkland & Ellis, New York City, for Defendant.

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION TO REMAND

HELLERSTEIN, District Judge.

Plaintiff Chase Manhattan Bank ("Chase") moves to remand this removed case to the New York Supreme Court, alleging that the district court lacks subject matter jurisdiction. Chase argues that since its lawsuit to require defendant Motorola, Inc. ("Motorola") to honor a $300 million Guarantee was brought for the benefit of a 24–bank consortium, the citizenship of each bank must be considered in a determination of jurisdiction. Because not every bank in the consortium is diverse with Motorola, Chase argues for remand. Motorola disagrees, contending that under the agreements at issue only the citizenship of Chase is material.

I deny Chase's motion. The relevant agreements give only Chase the right to require Motorola to honor its Guarantee, and a judgment for or against Chase would bind the entire bank consortium. The federal courts are a constitutionally appropriate forum to hear and resolve such suits

between parties of diverse citizenship. *See* 28 U.S.C. § 1332.

### *Facts*

In December 1998, Chase and twenty-three other banks lent approximately $800 million to Iridium Operating LLC, a satellite telecommunications company that was developing a first-of-its-kind worldwide wireless satellite telecommunications service. Motorola originated the project in the mid–1980's. In 1991, Motorola formed Iridium, Inc., a wholly owned subsidiary. After others invested, Iridium, Inc. was merged in 1996 into a newly created Delaware limited liability company, Iridium LLC., and, in December 1997, Iridium LLC's assets were transferred to Iridium Operating LLC ["Iridium"],[1] a Delaware limited liability company wholly owned by Iridium LLC. In August 1999, involuntary petitions of bankruptcy were filed against Iridium Operating and Iridium LLC in the Bankruptcy Court of the Southern District of New York. The entities then filed voluntary petitions in the Bankruptcy Court of the District of Delaware. The proceedings are pending, apparently in both courts but perhaps more actively in the Delaware court. A suit is also pending in the District of Delaware, *The Chase Manhattan Bank v. Iridium Africa Corp. et al.,* Civ. Action No. 00–564, and there may perhaps be other suits as well.

In the action before me, Chase brought suit as administrative and collateral agent for the syndicate, to enforce Motorola's agreement to execute and deliver its Guarantee. In its complaint, filed in the New York Supreme Court June 9, 2000, Chase alleged that the action arose from Motorola's breach of an unconditional and irrevocable commitment to provide a $300 mil-

---

1. For the purpose of this opinion, even though there are several Iridium entities, I will refer to all as Iridium, without distin-guishing among them. I do not find it necessary in this decision to consider the potential differences among the entities.

lion loan guarantee to Chase. Specifically, the complaint alleges, after detailing the set of agreements, that numerous triggering events occurred, spawning the right of Chase to seek the Guarantee. Upon the occurrence of these triggers, Chase maintains that it demanded from Motorola, in July 1999, performance of the Guarantee Obligation. Chase alleged that Motorola breached the terms of the Loan Agreements, which provided specifically that "at any time after the occurrence and during the continuation of any Trigger Event, Chase could exercise all the rights, powers and remedies of Iridium [ ], specifically including the right to require" delivery of the Guarantee by Motorola for the benefit of the Lenders.

### The Agreements

The loan underlying the disputed guarantee in question was made pursuant to a package of agreements. Simplified, each of the 24 banks agreed to lend a portion of the total $800 million commitment to Iridium, and Iridium agreed to repay each lender and to execute a note in favor of any lender so requesting. Motorola's Guarantee of $300 million was collateral for the $800 million loan to Iridium by the bank consortium. Motorola agreed to execute and deliver its Guarantee, initially to Iridium and then, by assignment, to Chase as collateral agent and administrative agent on behalf of the consortium. The Guarantee was deliverable upon demand by Chase following the occurrence of a triggering Event of Default, and guaranteed each lender prompt payment of principal and interest in full, proportionally to the extent of the Guarantee. *See* Credit Agreement § 8.09; Guarantee Agreement § 2.01; Security Agreement, Article III(e)(vii); Motorola Consent § 3.08(a). The Agreements thus gave Chase the right to sue Motorola if, notwithstanding Chase's demand, Motorola refused to execute and deliver its Guarantee as required by the operative agreements. Once the Guarantee was executed and delivered, any lender, Chase included, was given the right thereafter to sue Motorola for repayment of remaining load indebtedness, and to utilize the Accelerated Judgment procedure in lieu of complaint, as provided by New York C.P.L.R. § 3213.

The Senior Secured Credit Agreement provides the terms and conditions of the loan to Iridium: the commitments of the lending banks, the conditions of funding, the terms of repayment, Iridium's representations and warranties, etc. Section 8.09 of the agreement provides for Motorola, upon Iridium's demand following a Trigger Event (i.e., an event of default), to execute and deliver its Guarantee Obligation in favor of Chase for the benefit of the lending banks. Section 8.09 provides:

> Not later than seven Business Days after the occurrence of any Trigger Event, [Iridium] will require Motorola to perform the Motorola Guarantee Obligation (to the extent of a maximum amount of $300,000,000), such performance to include the execution and delivery by Motorola of its guarantee, ... in favor of the Administrative Agent [Chase] for the benefit of the Lenders in respect of the Borrower's obligations under this Agreement in a maximum amount of $300,000,000....

Credit Agreement § 8.09(a). Article VIII then provides when and under what conditions the obligation terminates or Motorola is otherwise released from its commitments pursuant to the Guarantee. The specific events of default are provided in Article IX.

Chase's powers and duties as administrative agent are provided in Article X. The lending banks each appoint Chase administrative agent and collateral agent,

and authorize and empower Chase to take actions and exercise powers on their behaves, except that Chase may not, without the prior consent of the lenders, modify the terms of the Motorola Guarantee. Furthermore, pursuant to Article X, each lender, "independently and without reliance upon the Agents," reserves the right "to make its own decisions in taking or not taking action under or based upon this Agreement, any other Credit Document or any related agreement. . . ." [2]

The terms of Motorola's Guaranty are also set out in a Pledge and Security Agreement ("Security Agreement") among Iridium, various Iridium affiliates (referred to as the Subsidiary Guarantors), and Chase as collateral agent for the lenders. Like the Credit Agreement, the Security Agreement provides that Chase as collateral agent has the right, upon a triggering event, to demand execution and delivery by Motorola of its $300 million Guarantee as security for the lending banks' $800 million loan. Further to confirm and implement the Security Agreement, Motorola executed a Consent Agreement in favor of Iridium and Chase as administrative agent and collateral agent, pursuant to which it consented to Iridium's assignment to Chase of Motorola's Guaranty Obligation and acknowledged that Chase as collateral agent had the right "to exercise any and all rights of Iridium," that Motorola would "comply in all respects with such exercise" by Chase, and that Chase had "full right and power" to enforce Motorola's obligations "directly against Motorola." Consent Agreement §§ 3.01–3.02.

**2.** Although each lending bank was given the right to make its own decisions following Motorola's execution and delivery of its Guarantee to Iridium or its assignee Chase, only Chase could enforce Motorola's obligations to execute and deliver the Guarantee. *See, e.g.,* Consent Agreement §§ 3.01–3.02.

## Discussion

Motorola timely removed the action to this court, alleging that since only Chase was given the right to demand that Motorola execute and deliver its Guarantee and bring suit to compel Motorola to do so, complete diversity existed between it and Chase.[3] Chase followed by moving to remand to New York Supreme Court. Since the court's jurisdiction to act should precede consideration of the merits, *see Curley v. Brignoli, Curley & Roberts Assocs.,* 915 F.2d 81, 83 (2d Cir.1990) ("subject matter jurisdiction is an unwaivable sine qua non for the exercise of federal judicial power"), and with the parties' consent, I address only the motion to remand at this time.

█ The jurisdiction of the United States district courts is limited by Constitution and statute. Where the diverse citizenship of the parties is the basis of jurisdiction, the citizenship of all plaintiffs must be diverse from those of all defendants. *See E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.,* 160 F.3d 925, 930 (2d Cir.1998) (*citing Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806)). It is not clear, however, what should be the rule when a party to a lawsuit, invested with the power to act alone and which has sued individually, has filed its suit also to carry out its contractual duties to others. Should the citizenship of only the parties, or also of the non-parties, be considered for purposes of diversity?

The question is not without nuanced answers, supplied by the various courts to have considered the issue in varying con-

**3.** Motorola also moved to dismiss a portion of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. That motion awaits my decision on jurisdiction.

texts. In *Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980), the Supreme Court held that where the trustees of a Massachusetts business trust brought suit, diversity depended on the citizenship of the trustees, not the beneficiaries, even though the trustees were acting entirely for the benefit of the trust beneficiaries. Under Massachusetts law, a trust was not itself a juridical person; its property was legally owned by the trustees, who alone possessed the powers to hold, manage and dispose of the assets of the trust, and the trust could sue and be sued only by its trustees. Thus, the trustees were the "real and substantial parties to the controversy," not the beneficiaries, even though the beneficiaries had used the trust form to make their real estate investments. What was critical, Justice Powell wrote, was that the trustees were not "mere conduits" for the beneficiaries, but maintained the "distinctive rights and duties" of trustees. *Navarro Savings Ass'n*, 446 U.S. at 460–61, 465, 100 S.Ct. 1779. Diversity of citizenship was to be determined by the citizenship of the trustees.

In *Snyder v. Harris*, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), the issue was whether, in a class action founded on diversity of citizenship, the citizenship of the class representative, or the citizenship of all members of the class for whose benefit the representatives purported to act, was to be considered. The Supreme Court held:

> Under current doctrine, if one member of a class is of diverse citizenship from the class' opponent, and no nondiverse members are named parties, the suit may be brought in federal court even though all other members of the class are citizens of the same State as the defendant. . . .

*Id.* at 340, 89 S.Ct. 1053 (*citing Supreme Tribe of Ben Hur v. Cauble*, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921)). If a class representative has a "crucial interest" in the outcome of a litigation and there is commonality and typicality of issues, suitability for class treatment, and fitness of the class representative, a judgment by or against him binds the absent class members. *See* Fed.R.Civ.P. 23; *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). The fact that non-diverse persons may enjoy benefit or incur detriment by reason of the judgment by or for the class representative is jurisdictionally immaterial, even if the non-diverse persons also have "a crucial interest in the outcome." *E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 936 (2d Cir.1998).

In the *Squibb* lawsuit, plaintiff had sued an underwriter at Lloyd's who, with an underwriting group, had insured plaintiff against loss from sales of the drug diethylstilbestrol (DES). The Court of Appeals, distinguishing its earlier decision (*"Squibb I"*) and taking note of a change in the particular individual defendant who was the substituted party-defendant, held that only the citizenship of the defendant had to be considered. A judgment for or against defendant personally, because of the contracts between that defendant and all the "names" in the Lloyd's underwriting group, bound each and all those "names." *E.R. Squibb & Sons, Inc. v. Lloyd's & Companies*, 241 F.3d 154 (2d. Cir. 2001) (*"Squibb II"*).

At the outset of the lawsuit, plaintiff had named as defendant a different lead underwriter, naming him "as a representative underwriter representing certain underwriters at Lloyd's" (i.e., the subscribing syndicate, those who had subscribed to the insurance policy that indemnified plaintiff). The defendant appeared in both his indi-

vidual capacity and as the representative of the underwriters in question, as named by plaintiff. *See Squibb I*, 160 F.3d 925 (2d Cir.1998). The Court of Appeals, nothing that the lead underwriter was sued in his representative capacity for the syndicate members, held that each member's citizenship had to be considered for diversity purposes. Since the lead underwriter did not, as had the trustees in *Navarro*, "own th[e] wealth [of the syndicate members] or exercise over it any dominion other than the power to underwrite risks," jurisdiction could not rest on his citizenship alone. *Squibb I*, 160 F.3d at 931.

Plaintiff's amended lawsuit in *Squibb II*, against the substituted lead underwriter personally, and not as representative, presented significant juridical distinctions. A judgment against the representative potentially bound the syndicate members as if they were actual parties, avoiding collection problems pursuant to a judgment. This was because the contracts in force at Lloyd's provided that each member, severally, had agreed to "abide by the final decision" of a court against the lead member. However, a judgment against only the lead underwriter in his personal capacity would have required a second lawsuit against syndicate members to enforce their several contracts with the lead. *See Squibb I*, 160 F.3d at 937 n. 26. Hence, the Court of Appeals held in *Squibb II* that because the lead underwriter had been sued in only his personal capacity, only the citizenship of the lead was material for the purpose of diversity jurisdiction.

In contrast, the agent in *Airlines Reporting Corp. v. S and N Travel, Inc.*, 58 F.3d 857, 862 (2nd Cir.1995), was a "mere conduit" for collection of a "remedy owing to others," an agency created by airline companies to collect moneys due from travel agencies. The Court of Appeals held that the air carriers, as the "ones injured by the defendants' conduct, ... cannot by enlisting their association as their champion break out of the limits of the diversity jurisdiction." *Id.* They, not their association, were the "real and substantial parties" to the dispute. *Id.* at 862 (*citing Navarro Savings Ass'n v. Lee*, 446 U.S. at 460–61, 465, 100 S.Ct. 1779).

In contrast, also, non-juridical business organizations may not arrogate to themselves the several citizenships of their members. Thus, regardless whether they pass the real-party-in-interest test of parties, *see* Federal Rule of Civil Procedure 17, and regardless how their states of creation or recognition treat them, federal law does not regard such non-juridical business organizations as having a citizenship different from those of its members. *See C.T. Carden v. Arkoma Assoc.*, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990) (limited partnership: held, citizenship of each general and limited partner must be considered for diversity jurisdiction); *Steelworkers v. R.H. Bouligny, Inc.*, 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965) (unincorporated association of union workers); *Chapman v. Barney*, 129 U.S. 677, 9 S.Ct. 426, 32 L.Ed. 800 (1889) (joint stock company).[4]

▮ The agreements in the case before me give Chase, and not the other banks in the syndicate, the right to require Motoro-

---

4. If, in a *Carden, Bouligny,* or *Chapman* fact pattern, a representative of a numerous class of parties, laborers or investors sued as a class representative, it is possible that only the citizenship of the class representative, and not those of the members of the class, would have been considered. *See Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969); *C.T. Carden v. Arkoma Assoc.,* 494 U.S. at 207, 110 S.Ct. 1015 (dissenting opinion); Hart & Wechsler's The Federal Courts and the Federal System, at 1541 (4th ed.1996).

la to execute and deliver its Guarantee. *See, e.g.,* Consent Agreement § 3.02. Chase filed suit pursuant to this, and similar clauses, in the set of agreements defining the rights and obligations of the several parties. There is commercial reason and purpose so to centralize powers in a complicated bank financing. Each lending bank could, under the agreements, demand its own promissory note, and each lending bank could itself, under the agreements, demand payment of a past-due note and sue upon it and upon any Guarantee, once the Motorola Guarantee was executed and delivered. But only Chase was given the right and power, upon a triggering event, to demand that Motorola execute and deliver its Guarantee.

The relationships within a bank syndicate are often fractious in the event of a borrower's default and, frequently, in the anticipation of such an event. The lead bank is often at the mercy of banks holding smaller positions, and precipitous actions of a minority can often dominate the majority will and induce disfavored action by the lead bank. Thus, there is sound commercial purpose for a guarantor like Motorola to require centralized decision-making by the lead bank in connection with the guarantor's obligation to execute and deliver a significant guarantee. Thus, Chase, as lead bank, was given the right and power to determine if triggering events were sufficiently significant, and if there was sound commercial purpose to cause it to demand that Motorola execute and deliver its Guarantee. Thus, the Chase Complaint, in suing upon Motorola's alleged breach of contract in failing to execute and deliver its Guarantee, describes the dispute as between itself and Motorola—that Motorola breached its contractual duties "to Chase," and that Chase has the "exclusive right to enforce the Motorola Guarantee on behalf of the Lenders."

By refusing to execute and deliver the Motorola Guarantee to Chase, Motorola deprived Chase of the right to receive the benefits of the Motorola Guarantee, thereby breaching its contractual duties to Chase under the Loan Agreements to deal fairly and in good faith with Chase.

Complaint at ¶ 63; *see also* Complaint at ¶¶ 7, 8. The complaint makes no mention of the other lenders as either having the right to demand and sue upon the Guarantee, or as being the parties aggrieved by Motorola's failure and refusal to execute and deliver its guaranty. That right to make demand and bring suit was given to Chase as collateral and administrative agent, in control of the collateral in the form of the Motorola Guaranty for the lending banks in the syndicate, and thus the real party in interest for the purpose of diversity. *See* Consent Agreement § 3.08; *Navarro Savings Ass'n,* 446 U.S. at 461, 463, 100 S.Ct. 1779; *Bullard v. Cisco,* 290 U.S. 179, 54 S.Ct. 177, 78 L.Ed. 254 (1933) (where members of committee had been given full title to deposited bonds and right to control their disposition, diverse citizenship determined by citizenship of members of a committee and not of beneficiaries). That the other lenders may ultimately benefit from Chase's acts is irrelevant, for federal courts "regularly exercise diversity jurisdiction in cases where non-diverse individuals or groups who are not direct parties to the litigation nevertheless have a crucial interest in its outcome." *See Squibb I,* 160 F.3d at 936–37. The rights of the other lenders to proceed against Motorola were dependent on a condition precedent: the successful enforcement by Chase of Motorola's obligation to execute and deliver its $300 million Guarantee. Upon Chase's successful enforcement of its rights against Motorola, any bank in the group could thereafter take advantage of the simplified procedure provided by the New York CPLR of a summary judgment in lieu of · complaint to

recover judgment upon an "instrument for the payment of money only." N.Y. C.P.L.R. § 3213 (McKinney 2000).

The rules defining diversity of citizenship, although perhaps "technical, precedent-bound, and unresponsive to policy considerations raised by the changing realities of business organizations," *Carden v. Arkoma Assoc.,* 494 U.S. 185, 196, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990), do not have to be procrustean.[5]  Courts are not required, where diversity exists, to look for strained ways to avoid jurisdictional consequences.  Courts are no more free to avoid cases and controversies within their jurisdiction, as they are commanded to resist jurisdictional impositions.  *Alabama Pub. Serv. Comm'n v. Southern R. Co.,* 341 U.S. 341, 361, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) (Frankfurter, J., concurring in result).

Federal district court jurisdiction based on diversity is constitutionally authorized and was originally provided, decades before federal courts gained consistent and general jurisdiction to hear cases arising from the laws and constitution of the United States.  *See* U.S. Const., Art. III, § 2; Jud. Act 1789, § 11, 1 Stat. 79; Hart & Wechsler's The Federal Courts and the Federal System, (4th ed.1996), *compare* notes at 878–883 (federal question jurisdiction), with notes at 1521–1524 (diversity jurisdiction).  In a constitutional scheme of checks and balances, the right of out-of-state litigants to sue in, or remove to, the federal courts was considered a necessary counter-balance to the full faith and credit to be given to state court judgments; both were considered necessary components of our federalist structure.

The contemporary regard for the federal courts in interstate and foreign transactions matches the respect that was had at our nation's birth.  Even though there can be no difference of substantive law, *see Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); D.P. Currie, The Federal Courts and the American Law Institute, 36 U. Chi. L.Rev. 1, 4 (1968), and little difference in procedural law, the federal district courts remain a forum of choice where out-of-state litigants have an option between federal and state courts.  The sentiment expressed almost 200 years ago by Justice Marshall,

> However true the fact may be, that the tribunals of the states will administer justice as impartially as those of the nation, to parties of every description, it is not less true that the constitution itself either entertains apprehensions on this subject, or views with such indulgence the possible fears and apprehensions of suitors, that it has established national tribunals for the decision of controversies between aliens and a citizen, or between citizens of different states.

*Bank of the United States v. Deveaux,* 9 U.S. 61, 5 Cranch 61, 87, 3 L.Ed. 38 (1809); *see* H.J. Friendly, The Historic Basis of Diversity Jurisdiction, 41 Harv. L.Rev. 483, 492 (1927), is a sentiment that remains close to the heart of most modern practitioners as well.

The case at bar presents a substantial and complicated interstate financing transaction.  If there is diversity of citizenship, the parties should have the right to opt for the federal court, and the federal courts should not shirk the responsibility that the parties seek to impose on it.  Federal jurisdiction to hear and decide, responsively, fairly and intelligently, and thereby to advance commerce among the states and

---

**5.**  The attempt to confine ideas to a pre-formed mold, derived from the mythological robber-host who stretched his victims or cut off their legs to fit them to his bed;  thus, "must we attempt to confine the Platonic dialogue on the Procrustean bed of a single idea?"  Oxford English Dictionary, II 271 (1971) (*quoting* 1875 JOWETT Plato).

with foreign nations, remains a federal constitutional goal.

Motorola provided the Guarantee at issue here to Iridium, and Iridium assigned its rights and abilities to enforce that Guarantee to Chase. This case presents a dispute between Chase and Motorola, with Chase having been given the exclusive right to demand execution and delivery of the Guarantee for the benefit of the banks in the lending group. For the reasons shown, only the citizenship of Chase and Motorola is relevant in determining whether or not diversity of citizenship exists. Since diversity clearly exists, subject matter jurisdiction exists. Accordingly, Chase's motion to remand to the New York Supreme Court is denied.

SO ORDERED.