**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 18 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

DOUGLAS LENON; GREG POLAK;
LOUIS J. VELTRIE; WILLIAM C.
PETERSON; and LUCIANO
BUSNARDO, not in their individual
capacities but in their capacities as
Trustees of the Colorado Tile, Marble
and Terrazzo Workers' Pension Trust
Fund and Trustees of the Local No. 6
Colorado Tile Layers, Marble Masons
and Terrazzo Workers Vacation
Fund; WALTER KARDY; and
FRANK STUPAR, not in their
individual capacities, but in their
capacities as Trustees of and as the
Administrative Committee of the
Bricklayers and Trowel Trades
International Pension Fund and the
Bricklayers and Allied Craftworkers
International Health Fund; and the
COLORADO TILE, MARBLE and
TERRAZZO CONTRACTORS
ASSOCIATION, a Colorado non-
profit corporation,

      Plaintiffs-Appellees,

v.

ST. PAUL MERCURY INSURANCE
COMPANY, a Minnesota
corporation,

      Defendant-Appellant.

No. 96-1549

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 94-Z-2032)

Submitted on the briefs:

Timothy J. Parsons, David B. Seserman, and Dean C. Heizer of Gorsuch Kirgis, L.L.C., Denver, Colorado, for Plaintiffs-Appellees.

Laurence M. McHeffey and Frank C. Porada of McElroy, Deutsch & Mulvaney, Denver, Colorado, for Defendant-Appellant.

Before KELLY and HENRY, Circuit Judges, and DOWNES,[*] District Judge.

PER CURIAM

Plaintiffs, the trustees of four union trust funds and the Colorado Tile, Marble and Terrazzo Contractors Association, brought this action against defendant St. Paul Mercury Insurance Company seeking to recover under a surety bond St. Paul had issued to Wilkinson & Company. Plaintiffs' claims are based on a judgment in their favor in a separate action they brought against Wilkinson (the Wilkinson action or case) seeking fringe benefit contributions and other damages under collective bargaining agreements applicable to Wilkinson's work

---

[*]    The Honorable William F. Downes, District Judge, United States District Court for the District of Wyoming, sitting by designation.

-2-

at the Denver International Airport. The district court held that the surety bond St. Paul issued covered these damages and entered judgment in plaintiffs' favor. St. Paul appeals.[1]

In the meantime, Wilkinson appealed the judgment against it. We recently affirmed the district court's judgment against Wilkinson as it applied to the plaintiff trustees, but vacated the judgment and remanded the case as it applied to the Contractors Association. See Trustees of Colo. Tile, Marble & Terrazzo Workers Pension Fund v. Wilkinson & Co., Nos. 96-1205, 96-1431 (10th Cir. February 3, 1998) (unpublished). Because we affirmed the judgment in favor of the plaintiff trustees, and because the resolution of this appeal does not turn on the Contractors Association's claims, we conclude it is appropriate to resolve this appeal now rather than wait for proceedings to conclude in the Wilkinson action.

On the merits, we reject St. Paul's argument that the district court lacked subject matter jurisdiction, but agree that the type of damages plaintiffs seek are not covered under the surety bond. We therefore reverse.

_____

[1]     After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

-3-

# I. BACKGROUND

This case follows directly from plaintiffs' success on the claims they asserted in the Wilkinson action, which they filed in February 1994. That case essentially turned on whether Wilkinson, a New Jersey corporation, was required to use union labor on work it performed under subcontract at the Denver International Airport in Colorado. With one exception to be discussed later, plaintiffs are the same in both this case and the Wilkinson action. Plaintiff trustees are the named fiduciaries of four multiemployer welfare and pension benefit plans as defined by the Employee Retirement Income Security Act of 1974 ("ERISA"). They based their claims against Wilkinson on Section 515 of ERISA, 29 U.S.C. § 1145. Section 515 allows federal actions against employers for contributions allegedly due under the terms of multiemployer ERISA plans or collective bargaining agreements. Plaintiff Contractors Association is a Colorado nonprofit corporation that promotes the tile, marble and terrazzo trade in Colorado who also claimed it was due contributions under collective bargaining agreements.

The facts, briefly stated, were that Wilkinson was a signatory to a collective bargaining agreement between the Tile Contractors Association of Northern New Jersey, Inc., and Local No. 77 of New Jersey-Bricklayers and Allied Craftsmen (the "Local 77 CBA"). That agreement generally covered

workers known as "helpers" or "finishers." That agreement also contained a "traveling contractors" clause requiring Wilkinson to comply with an affiliated local's collective bargaining agreement when Wilkinson performed work outside the territory covered by the Local 77 CBA and in an affiliated local's territory.

Plaintiffs claimed that the work Wilkinson performed on the airport project was the type of work covered by the Local 77 CBA, and that pursuant to the Local 77 CBA traveling contractors clause, Wilkinson was obligated to comply with the union affiliate's agreement covering the airport project site. The applicable local agreement was one involving Local Union No. 6 of Colorado, International Union of Bricklayers and Allied Craftsmen (the "Colorado CBA"). That agreement essentially required the use of union labor and also required employers to make contributions to plaintiffs based on the number of hours worked by covered workers. Wilkinson neither used union labor nor made the contributions. Plaintiffs contended that Wilkinson breached the Colorado CBA and sought, as damages, contributions, interest and liquidated damages under the Colorado CBA and various trust fund agreements incorporated into that agreement for all workers the agreement covered.

The district court agreed with plaintiffs that under the plain language of the Local 77 CBA, the airport project was the type of work covered by the agreement. The court also determined that the Colorado CBA controlled the amount of

damages, and Wilkinson was therefore obligated to make contributions for all workers covered by that agreement. It therefore entered judgment in plaintiffs' favor in the amount of $197,098.76 plus attorney fees and costs.

In August 1994, prior to the district court's ruling in their favor in the Wilkinson case, plaintiffs brought this action alleging diversity jurisdiction under 28 U.S.C. § 1332 and seeking to recover the amounts they claimed Wilkinson owed them under the labor and material bond St. Paul issued to Wilkinson, pursuant to Colo. Rev. Stat. § 38-26-105(1), for the airport work. St. Paul moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), but the district court denied the motion in October 1995 and on reconsideration, in March 1996. St. Paul filed its answer in April 1996. In September 1996, while plaintiffs' summary judgment motion was pending, St. Paul again moved to dismiss, this time on grounds of lack of complete diversity. St. Paul, a citizen of Minnesota for diversity purposes, raised two arguments for lack of diversity: (1) that the citizenship of an ERISA plan is based on the citizenship of plan participants, not the plan's trustees, and plaintiffs could not show they were diverse from St. Paul; and (2) even if the plans' citizenship were based on the citizenship of its trustees, there was not complete diversity because one of the trustees was a citizen of Minnesota. Plaintiffs responded by contending that the citizenship of the plans

derived from the citizenship of the trustees and by moving to amend the complaint to delete the nondiverse trustee to maintain diversity.

Relying on Navarro Savings Association v. Lee, 446 U.S. 458 (1980), the district court agreed with plaintiffs that the citizenship of the trustees was what mattered and granted their motion to amend the complaint. The court subsequently granted plaintiffs' motion for summary judgment regarding liability under the bond and awarded judgment in plaintiffs' favor for $260,139.12, the total amount of the judgment on the merits plus attorney fees and costs awarded to plaintiffs in the Wilkinson action and in this case. St. Paul filed a notice of appeal. After the parties had filed their briefs in this appeal, we issued our decision on appeal in the Wilkinson action, Nos. 96-1205, 94-1431, which affirmed the judgment in favor of the plaintiff trustees, but vacated the judgment and remanded the case for further proceedings as it applied to the Contractors Association.

On appeal, St. Paul raises three arguments: (1) the district court lacked subject matter jurisdiction because the parties were not completely diverse; (2) the type of claim plaintiffs asserted was not covered by the bond; and (3) ERISA preempts plaintiffs' claims.

## II.  DISCUSSION

### A.  Jurisdiction

St. Paul challenges both the basis on which the district court determined plaintiffs' citizenship for diversity purposes and the court's decision that the nondiverse trustee was not an indispensable party under Fed. R. Civ. P. 19 and could be dismissed to preserve diversity under Rule 21.  The first issue goes to subject matter jurisdiction, and we review the district court's determination de novo.  See FDIC v. Hulsey, 22 F.3d 1472, 1479 (10th Cir. 1994).  The other issues--whether a party is indispensable and whether a dispensable party may be dismissed to maintain diversity--depend on the district court's careful exercise of discretion, and we review the court's determinations on those issues for abuse of discretion.  See Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr., 94 F.3d 1407, 1410-11 (10th Cir. 1996) (indispensability under Rule 19(b)), cert. denied, 117 S. Ct. 1427 (1997); Jett v. Phillips & Assocs., 439 F.2d 987, 989 (10th Cir. 1971) (dismissal under Rule 21).

St. Paul contends that ERISA plans are unincorporated associations rather than trusts.  Because the citizenship of unincorporated associations is based on the citizenship of all association members, see, e.g., Tuck v. United Servs. Auto. Ass'n, 859 F.2d 842, 844-45 (10th Cir. 1988),  and plaintiffs have not even

attempted to show that all plan participants are diverse from it, St. Paul contends

that the complete diversity required for jurisdiction under § 1332 did not exist.

In Navarro, the case on which the district court relied, the Court addressed

an argument somewhat similar to St. Paul's--that a trust, in that case, a business

trust, was actually an unincorporated association and that its citizenship should be

based on the citizenship of its shareholders rather than its trustees. See 446 U.S.

at 461-62. The Court began its discussion by recognizing that

> [e]arly in its history, this Court established that the "citizens" upon
> whose diversity a plaintiff grounds jurisdiction must be real and
> substantial parties to the controversy. Thus, a federal court must
> disregard nominal or formal parties and rest jurisdiction only upon
> the citizenship of real parties to the controversy.

id. at 460-61 (citations omitted). The Court then noted that a trust may resemble

an association or even a corporation, but stated that the trust at issue "is an

express trust, and the question is whether its trustees are real parties to this

controversy for purposes of a federal court's diversity jurisdiction." Id. at 462.

The Court concluded that

> a trustee is a real party to the controversy for purposes of diversity
> jurisdiction when he possesses certain customary powers to hold,
> manage, and dispose of assets for the benefit of others. The trustees
> in this case have such powers. At all relevant times, [the trust]
> operated under a declaration of trust that authorized the trustees to
> take legal title to trust assets, to invest those assets for the benefit of
> the shareholders, and to sue and be sued in their capacity as trustees.
> [The trustees] filed this lawsuit in that capacity. . . . [The trust's
> beneficial shareholders] can neither control the disposition of this

action nor intervene in the affairs of the trust except in the most extraordinary situations.

We conclude that these respondents are active trustees whose control over the assets held in their names is real and substantial. That the trust may depart from conventional forms in other respects has no bearing on this determination. . . . [The trustees] have legal title; they manage the assets; they control the litigation. In short, they are the real parties to the controversy.

Id. at 464-65 (footnotes omitted).

We agree with the district court that Navarro controls this case, and we find St. Paul's efforts to distinguish Navarro unpersuasive.[2] As in Navarro, the trustees brought suit in their own name in their capacities as trustees of an express trust. St. Paul contends that ERISA plans are not trusts because "[t]rusts are entities typically created under state law[, but] ERISA plans are governed by a complex set of federal statutes." Appellant's Br. at 8. Regardless of what law applies, we cannot see how it can seriously be argued that an employee benefit plan under ERISA is not an express trust. Compare, e.g., Restatement (Second) Trusts § 2 (defining express trust generally as a "fiduciary relationship with respect to property"), with 29 U.S.C. §§ 1101-1114 (describing fiduciary

---

[2]     St. Paul does not challenge the trustees' capacity to bring this action. See Rule 17(a) (trustee of express trust "may sue in that person's own name without joining the party for whose benefit the action is brought"); see also Navarro, 446 U.S. at 463 n.9 (noting "'rough symmetry' between the 'real party in interest' standard of Rule 17(a) and the rule that diversity jurisdiction depends upon the citizenship of real parties to the controversy").

responsibilities with respect to ERISA plans including, inter alia, requirements that named fiduciaries have authority to manage and control plans (§ 1102(a)(1)) and that with limited exception all plan assets be held in trust (§ 1103(a))). Moreover, there is no question--indeed, St. Paul does not even attempt to argue to the contrary--that the trustees here possess the "customary powers to hold, manage, and dispose of assets for the benefit of others," Navarro, 446 U.S. at 464. St. Paul also argues that the fact that 29 U.S.C. § 1132(a) allows plan participants and the plan itself as well as the trustees to initiate suits somehow means that ERISA plans cannot be trusts. We cannot see how the power of participants or the plans themselves to initiate civil actions in limited circumstances can deprive an ERISA plan of its status as a trust.

St. Paul cites three post-Navarro cases in which courts have considered ERISA plans as unincorporated associations for diversity purposes. See Laborers Local 938 Joint Health & Welfare Trust Fund v. B.R. Starnes Co., 827 F.2d 1454 (11th Cir. 1987); Xaros v. U.S. Fidelity & Guar. Co., 820 F.2d 1176 (11th Cir. 1987); Recreation Servs., Inc. Defined Benefit Plan v. Utah Mortgage Co., 735 F. Supp. 856 (N.D. Ill. 1990). We find these cases distinguishable or unpersuasive. In Xaros, in which the plaintiffs were apparently plan trustees, the court concluded that the "trust funds appear to be voluntary unincorporated associations," and noted that the funds did not "allege[] facts negativing their

existence as voluntary unincorporated associations." 820 F.2d at 1181 (emphasis added). Significantly, the court did not cite Navarro, did not explain why the funds were not trusts, and declined to consider, without explanation, the argument that "diversity may be properly alleged by naming the trustees as representatives of the employee benefit plans." See id. at 1182. The other two cases simply followed Xaros without analysis. See Laborers Local 938, 827 F.2d at 1457; Recreation Servs., 735 F. Supp. at 859. In addition, the plaintiffs in these two cases were the ERISA plans themselves, not the trustees. Because these cases failed to address the diversity issue under Navarro where the trustees bring suit in their own name on behalf of the ERISA plans, we decline to follow them.[3]

---

[3]  Few decisions address the citizenship of ERISA plans for diversity purposes. Most cases seem to note their status as express trusts and move on. See, e.g., Central States, S.E. & S.W. Areas Pension Fund v. Art Pape Transfer, Inc. 79 F.3d 651, 653 (7th Cir. 1996) ("The record in this case does not reveal the citizenship of the Fund's trustees, and therefore it does not support adjudication under the diversity jurisdiction."); Trustees of Colo. Pipe Indus. Pension Trust v. Howard Elec. & Mechanical, Inc., 909 F.2d 1379, 1380-81 (10th Cir. 1990) ("The Colorado Pipe Industry Pension Fund (the [ERISA] fund) is an express trust established to provide retirement benefits for employees in the plumbing and pipefitting industry in the State of Colorado."); Prescription Plan Serv. Corp. v. Franco, 552 F.2d 493, 496 n.1 (2d Cir. 1977) (noting that parties agreed citizenship of trustees determines citizenship of plan for diversity purposes); see also NYSA-ILA GAI Fund v. Poggi, 617 F. Supp. 847, 849-50 (S.D.N.Y.) (holding that under Navarro, citizenship of ERISA plan based on citizenship of trustees), reaff'd as amended on reconsideration, 624 F. Supp. 443 (S.D.N.Y. 1985).

-12-

St. Paul also contends that this case is controlled not by <u>Navarro</u> but by <u>Carden v. Arkoma Assocs.</u>, 494 U.S. 185 (1990), which addressed the citizenship of a limited partnership for diversity purposes. The Court "reject[ed] the contention that to determine, for diversity purposes, the citizenship of an artificial entity, the court may consult the citizenship of less than all of the entity's members. We adhere to our oft-repeated rule that diversity jurisdiction in a suit by or against the entity depends on the citizenship of 'all the members.'" <u>Id.</u> at 195 (citation omitted). <u>Carden</u>, however, distinguished <u>Navarro</u> by stating that it "did not involve the question whether a party that is an artificial entity other than a corporation can be considered a 'citizen' of a State, but the quite separate question whether parties that were undoubted 'citizens' (viz., natural persons) were the real parties to the controversy." <u>Id.</u> at 191. Were the ERISA plans here the named plaintiffs, St. Paul's reliance on <u>Carden</u> might be justified. That is not the situation. The trustees are the named plaintiffs, and we find this case indistinguishable from <u>Navarro</u>.[4]

---

[4] In <u>Carden</u>, the Court seemed to acknowledge that the analyses in <u>Navarro</u> and <u>Carden</u> appear at odds: "The resolutions we have reached above can validly be characterized as technical, precedent-bound, and unresponsive to policy considerations raised by the changing realities of business organization. But, as must be evident from our earlier discussion, that has been the character of our jurisprudence in this field . . . ." 494 U.S. at 196.

We thus conclude that the district court correctly looked to the citizenship of the trustees for diversity purposes here. All of the trustees here are diverse from St. Paul save one--John Wallner, a trustee of the Bricklayers and Allied Craftsmen International Health Fund and the Bricklayers and Trowel Trades International Pension Fund. The question now is whether the district court was correct in dismissing Wallner under Rule 21 to preserve diversity.

"[I]t is well-settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time [to preserve diversity jurisdiction], even after judgment has been rendered." Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 832 (1989); see also Tuck, 859 F.2d at 845. Rule 21 allows the court to dismiss parties "on such terms as are just," thus granting considerable discretion to the district court. See Jett, 439 F.2d at 989-90; Moore's Federal Practice § 21.02[4] (3d ed. 1997). That discretion is circumscribed, however, by Rule 19(b) because the court cannot proceed without indispensable parties. See Newman-Green, 490 U.S. at 832; Jett, 439 F.2d at 990. Whether a party is indispensable, considering the factors required under Rule 19(b), is a matter left to the district court's discretion. See Navajo Tribe of Indians v. New Mexico, 809 F.2d 1455, 1471 (10th Cir. 1987).[5]

---

[5] Unfortunately, the district court did not fully explain in its brief oral order on this matter why it concluded Trustee Wallner was not indispensable

(continued...)

-14-

St. Paul contends that if the citizenship of the ERISA plans is determined by the citizenship of the trustees, then all of the trustees must be considered at all times, relying on the Court's statement in Carden that "[w]e have never held that an artificial entity, suing or being sued in its own name, can invoke the diversity jurisdiction of the federal courts based on the citizenship of some but not all of its members," 494 U.S. at 192. Because all of the trustees were not diverse at the outset of the litigation, St. Paul contends the district court was prohibited from dismissing the nondiverse trustee to preserve diversity. Otherwise, trusts could forum shop by selectively choosing which of its trustees to name as plaintiffs in a particular action. Alternatively, it argues that Trustee Wallner must be considered indispensable because there would be nothing to stop him from filing a state court action if the other trustees do not prevail in this case.

Again, we find Carden inapposite because this case does not involve an artificial entity "suing or being sued in its own name."[6] We also reject St. Paul's

---

[5](...continued)
under Rule 19(b), why in "equity and good conscience" the case could proceed without him, or why it was "just" to dismiss Trustee Wallner under Rule 21. This court is always concerned that reviewing a district court's exercise of discretion on a complex matter with an inadequate record runs the risk of having this court exercise that discretion in the first instance, something we are not empowered to do. In this instance, however, we conclude that the record is marginally sufficient to allow this court to review the district court's exercise of discretion in these matters.

[6]     We express no opinion on this issue as it might apply to cases in
(continued...)

argument that all trustees must be indispensable under Rule 19(b) and that a trustee is therefore not susceptible to dismissal under Rule 21. St. Paul cites no authority supporting what would amount to a categorical, technical rule that all trustees are always indispensable parties; the only case addressing a similar situation of which we are aware is to the contrary. See Prescription Plan Serv. Corp. v. Franco, 552 F.2d 493, 497 (2d Cir. 1977) (affirming dismissal of two ERISA plan trustees to preserve diversity under Rule 21 where interests of trustees remaining in case were identical to dismissed trustees). Such a rule would be inconsistent with the pragmatic considerations that guide the analysis under Rule 19(b). See HB General Corp. v. Manchester Partners, L.P., 95 F.3d 1185, 1191 (3d Cir. 1996) ("In contrast to Carden's jurisdictional rule, which the Supreme Court acknowledged to be technical, precedent-bound, and unresponsive to policy considerations, whether a person is indispensable depends on pragmatic considerations.") (quotations and citations omitted); Curley v. Brignoli, Curley & Roberts Assocs., 915 F.2d 81, 88-92 (2d Cir. 1990). Instead of being based on application of categorical rules, "[t]he decision whether to dismiss (i.e., the decision whether the person missing is 'indispensable') must be based on factors varying with the different cases, some such factors being substantive, some

---

[6](...continued)
which the party is the ERISA plan or trust fund itself.

procedural, some compelling by themselves, and some subject to balancing against opposing interests." Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 118-19 (1968).

St. Paul's concern with abusive forum shopping can be addressed through the analysis of indispensability. See id. at 111 (noting that Rule 19(b) takes into account "interest of the courts and the public in complete, consistent, and efficient settlement of controversies"); Prescription Plan Serv., 552 F.2d at 497 n.5 (noting that representative parties should not be manipulated to obtain diversity jurisdiction). The analysis and equities may differ somewhat depending on whether the issue arises early in the litigation under a Rule 12(b)(7) motion, for example, or later under a Rule 21 motion. Possible forum shopping may be more critical early in the litigation while judicial economy may take on greater importance if the question does not arise until later in the litigation. But the ultimate concerns of the district court in either situation are "whether in equity and good conscience the action should proceed among the parties before it, the absent person being thus regarded as indispensable," Rule 19(b), and whether dismissal of a dispensable party is "just," Rule 21. And these turn on pragmatic rather than technical considerations.

As the party seeking dismissal for inability to join an allegedly indispensable party, St. Paul has the burden of persuasion. See Rishell, 94 F.3d at 1411. To determine whether a party is indispensable, a court must consider

> first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Rule 19(b). St. Paul addresses only the first of these factors, contending that it could be prejudiced by Wallner filing a separate state court action should the trustees fail to prevail in this action. This contention, however, fails to consider the res judicata effect of a judgment against the other trustees, since all trustees would be suing in their representative capacities and almost certainly be found to be in privity with each other. Moreover, under the second factor, the court could avoid any possible prejudice by fashioning relief to require the party trustees to bind the trust, and consequently the other trustee, to the judgment rendered in this case. The third factor, which includes public and judicial interests in complete and efficient resolution of disputes, see Provident Tradesmens Bank, 390 U.S. at 111, also favors a finding of dispensability. The fact of Trustee Wallner's nondiversity and the issue of whether or not he was indispensable did not arise until two years after plaintiffs filed their complaint. The district court concluded

that plaintiffs were not guilty of any "shenanigans" in picking and choosing the named plaintiffs in an attempt to manipulate federal court jurisdiction, see Appellants' Br., Ex. B at 4-5, and St. Paul does not argue to the contrary. The fourth factor, the availability of an alternate forum if the action is dismissed, which we presume would be the situation here, is not a sufficient reason by itself for dismissing an action for nonjoinder. See Rishell, 94 F.3d at 1413.

We therefore conclude that the district court did not abuse its discretion in dismissing Wallner as dispensable to preserve diversity and hold that the court had subject matter jurisdiction.

## B. Colorado Public Works Act

St. Paul issued the bond to Wilkinson pursuant to the Colorado Public Works Act, Colo. Rev. Stat. §§ 38-26-101 to 107. That act requires that a contractor on a public works construction project shall execute a penal bond with good and sufficient surety

> conditioned that such contractor shall at all times promptly make payments of all amounts lawfully due to all persons supplying or furnishing him or his subcontractors with labor, materials, rental machinery, tools, or equipment used or performed in the prosecution of the work provided for in such contract . . . . Subcontractors, materialmen, mechanics, suppliers of rental equipment, and others may have a right of action for amounts lawfully due them from the contractor or subcontractor directly against the principal and surety of such bond.

-19-

Colo. Rev. Stat. § 38-26-105(1).[7]  St. Paul contends that this statute does not

cover the fringe benefit contributions for which plaintiffs seek recovery here

because those contributions do not directly relate to any labor actually supplied or

furnished to Wilkinson, but instead are simply damages for breach of the

Colorado CBA.

In concluding that the contributions were covered by the statute, the district

court relied on Trustees of Colo. Carpenters & Millwrights Health Benefit Trust

Fund v. Pinkard Constr. Co., 604 P.2d 683 (Colo. 1979).  In Pinkard, the trustees

sought recovery under a bond issued pursuant to the statute for fringe benefit

contributions payable for work actually performed by the contractor's employees

on a public works project.  The defendants contended that the statute covered only

amounts payable directly to the workers, not those payable to the trust funds.

Relying on a Supreme Court case interpreting the analogous federal Miller Act,

see United States ex rel. Sherman v. Carter, 353 U.S. 210 (1957), the court held

that the amounts were "'payments . . . lawfully due'" under collective bargaining

agreements.  "Each one of these benefits was agreed to be paid by the

subcontractors in exchange for the work done by the construction workers.  Until

these were paid into the trust funds, the compensation to the workers was not

_____

<blockquote>[7]     The parties' arguments assume that the scope of the bond is governed by this statute.  We proceed from that assumption.</blockquote>

fully paid." Pinkard, 604 P.2d at 685. The district court here concluded that it does not matter that the contributions plaintiffs are seeking are not for the workers who actually did the work and cannot be considered part of their compensation.

We review the district court's interpretation of state law de novo, Salve Regina College v. Russell, 499 U.S. 225, 231 (1991), and we think it does matter that the contributions in question are not compensation for work actually performed. The statute covers the claims of "all persons supplying or furnishing [the contractor] with labor." § 38-26-105(1). We see no indication that it covers the claims of all persons who may have been entitled to supply or furnish the contractor with labor, whether or not they had a contractual right to do so. Wilkinson obviously breached the Colorado CBA by not hiring workers covered by that agreement. However, the fact is that those workers did not actually supply or furnish anything to Wilkinson. Thus, despite plaintiffs' protestations to the contrary, all they have is a simple derivative breach of contract claim against Wilkinson.

Colorado courts have not yet addressed whether § 38-26-105 covers breach of contract damages, but the general rule is that such damages, including lost

profits,[8] are not recoverable under public works bond statutes.  See, e.g., Lucas v. Western Cas. & Sur. Co., 176 F.2d 506, 508 (10th Cir. 1949) (interpreting Oklahoma public works bond statute); L.P. Friestedt Co. v. U.S. Fireproofing Co. 125 F.2d 1010, 1012 (10th Cir. 1942) (interpreting federal Heard Act, predecessor to Miller Act); United States ex rel. Mobile Premix Concrete, Inc. v. Santa Fe Eng'rs, Inc., 515 F. Supp. 512, 516 (D. Colo. 1981) (interpreting Miller Act); see also Blakeslee Arpaia Chapman, Inc. v. EI Constructors, Inc., 687 A.2d 506, 517 (Conn. 1997) (noting that its research disclosed no jurisdiction allowing recovery of unearned profits under Miller Act; "[T]he language and purpose of the [Miller Act], requiring payment for work performed or materials supplied, preclude such

---

[8]      In a broad sense, the unpaid contributions here are similar to lost profits.  They are amounts the ERISA plans would have "earned" had Wilkinson complied with the Colorado CBA.

-22-

recovery.").[9]  We therefore conclude that § 36-26-105(1) does not cover the breach of contract damages plaintiffs seek in this case.

## III.  CONCLUSION

We conclude that the district court erred in holding that the damages plaintiffs seek are covered under § 38-26-105 and recoverable under the bond St. Paul issued to Wilkinson.  We therefore do not need to address St. Paul's ERISA preemption argument.  The judgment of the district court is REVERSED.

---

[9]      The Colorado Supreme Court has relied on both the Miller Act and other states' public works bond acts in interpreting analogous provisions in the Colorado act.  See Pinkard, 604 P.2d at 685; Western Metal Lath v. Acoustical & Constr. Supply, Inc., 851 P.2d 875, 878 & n.3 (Colo. 1993).  Moreover, plaintiffs have not cited any authority holding that breach of contract damages are recoverable under these types of bonds.  They cite cases such as Trustees of Teamsters Constr. Workers Local No. 13, Health & Welfare Trust Fund v. Hawg N Action, Inc., 651 F.2d 1384, 1386-87 (10th Cir. 1981), which stands for the proposition that the trustees could recover--directly against the contractor--for contributions due under a collective bargaining agreement even though the nonunion workers on whose efforts the contributions were based would not ultimately benefit from the contributions.  That holding is consistent with our holding in the appeal of the Wilkinson case, but it has no bearing on the distinct issue of whether the bond statute covers the contributions in this case.