**Jack Eugene FRENCH, Randall E. Fisher and Paul Benton Weeks, III, Plaintiffs,**

**v.**

**Lynde SELDEN, Richard Rosenthal, Jack M. Stolier, Joe M. Stolier, Joe R. McCray, Jules B. LeBlanc, III, Robert B. Gerard and Clyde C. Greco, Jr., Defendants.**

No. 99–1121–JTM.

United States District Court, D. Kansas.

July 16, 1999.

---

Fred L Herman, Law Offices of Fred L. Herman, New Orleans, LA.

Randall E. Fisher, Wichita, KS, for Jack Eugene French, Randall E Fisher, Paul Benton Weeks, III, plaintiffs.

Randall E Fisher, Grace, Unruh & Pratt, L.C., Wichita, KS, pro se.

Patrick A. Hamilton, Hamilton & Goins, L.L.C., Overland Park, KS, Robert I Baudouin, Law Offices of Fred L. Herman, New Orleans, LA, for Lynde Selden, Richard H Rosenthal, Jack M Stolier, Joe R McCray, Jules B LeBlanc, III, defendants.

Patrick A. Hamilton, Hamilton & Goins, L.L.C., Overland Park, KS, Robert B Gerard, defendant.

Mark S. Gunnison, Payne & Jones, Chtd., Overland Park, KS, for Clyde C Greco, Jr., defendant.

### MEMORANDUM ORDER

MARTEN, District Judge.

The present case involves a dispute concerning the allocation of attorney fees following nationwide litigation concerning the safety of pickup trucks. Plaintiffs Jack French, Randall Fisher, and Paul Weeks alleged that a contract existed to divide fees, according to specified percentages, among Fisher, Weeks, and the defendants. Fisher and Weeks are attorneys residing in Kansas. The defendants are attorneys residing in California and Louisiana. The defendants have moved to dismiss the action on a variety of grounds.

### Factual Background

In the spring of 1993, plaintiff Paul Weeks agreed to represent Jack French in a class action asserting that the side-saddle gas tanks in GM pickup trucks made them unreasonably dangerous. Weeks subsequently filed suit on French's behalf in Jackson County, Missouri. In the summer of 1993, French received notice of a class action pending before the United States District Court for the Eastern District of Pennsylvania. The notice explained a proposed nationwide class settlement had been negotiated between GM and class counsel. Under the proposed settlement, owners of GM pickups would receive a $1000 price reduction if they were to purchase a new GM truck.

According to Weeks, French opposed the settlement because he was a retiree on a fixed income, and thus unable to afford a new truck. French wanted GM to make his truck safe, and asked Weeks to oppose the settlement. Weeks agreed, and also undertook to represent Robert West and Gary Blades (a son-in-law and a friend of French's) along with Charles Merritt (a friend of Weeks's) who also owned GM trucks. Weeks, appearing pro hac vice, filed objections and extensive briefing to the proposed "coupon" settlement in Philadelphia. Weeks also traveled to Philadelphia to present oral argument at an October 26, 1993 fairness hearing.

The court overruled the objections and approved the settlement, along with an award of $9.5 million to class counsel. Following final judgment by the Philadelphia court, GM moved to dismiss the Missouri state action as *res judicata*. Weeks dismissed the Missouri state action without prejudice, with a reservation to refile if the Philadelphia decision was overturned.

The Third Circuit reversed the district court's approval of the class settlement. *In re General Motors Corp. Pick–Up Truck Fuel Tank*, 55 F.3d 768 (3d Cir.), *cert. denied*, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995).

In mid–1996, Weeks learned that a GM trucks class action in Louisiana had been revived. French had received notice of a new proposed settlement, which again was primarily devoted to a "coupon" discount toward a future truck purchase. Weeks consulted with Professor John Coffee at the Columbia University School of Law, who suggested that Weeks talk to defendant Robert Gerard in San Diego, California. Coffee told Weeks that Gerard had experience in representing class objectors. Weeks called Gerard who was unavailable. He left a message, and Gerard returned his call almost immediately. Weeks and Gerard discussed the Louisiana litigation,

and Gerard agreed to get back with Weeks.

Weeks and French both contacted Fisher, who agreed to become involved in the action. Fisher and Weeks agreed to try to return the action to Philadelphia. On September 23, 1996 the two wrote to Louisiana class counsel that the French group would oppose the proposed Louisiana settlement.

When Gerard next spoke with Weeks, he told him he knew of another attorney in California, defendant Richard Rosenthal, interested in the action. According to Weeks, Rosenthal told him that he was particularly happy to be associated with French, who had succeeded in thwarting the initial coupon settlement. Weeks had numerous telephone conversations with Rosenthal and Gerard from September 26 through November, 1996. Rosenthal also mailed to Weeks copies of decisions involving class actions. Under a strategy agreed to among Weeks, Fisher, Gerard and Rosenthal, Weeks and Fisher would appear in the Philadelphia case to try to enjoin the Louisiana proceeding, while Gerard and Rosenthal agreed to appear in the Louisiana action and oppose the proposed settlement there.

In October, Rosenthal told Weeks during a telephone call that he wanted some other lawyers to join him in representing the French objectors in Louisiana: Lynde Selden of San Diego and Joe McCray form San Francisco. Later, Rosenthal told Weeks he wanted to have a Louisiana lawyer, Jack Stolier, involved in the representation.

According to Fisher, French agreed to representation by Rosenthal, Selden, Stolier and McCray, so long as any action taken on behalf of the French group was coordinated by Weeks, the lead counsel for French. According to Fisher and Weeks, the agreement among the attorneys was to work together as a team to stop the Louisiana action and to disqualify class counsel. Under this approach, Fisher and Weeks would attempt to obtain in Philadelphia an injunction against the Louisiana action;

Selden, Rosenthal, Stolier, and McCray would represent the French objectors in Louisiana; Gerard would represent clients of his own in both Philadelphia and Louisiana. During this time, Selden, Rosenthal, Stolier and McCray obtained additional clients of their own, who they represented in addition to the French objectors.

According to Weeks's affidavit, from September 1996 to March 15, 1999, Rosenthal, McCray, Selden and Stolier had "repeated" contact with Weeks and Fisher in Kansas by means of phone calls, faxes, mailings and overnight deliveries. (Weeks Aff. at 11, ¶ 34). Weeks does not quantify the exact number of such contacts, but stresses that the contacts by the defendants were "repeated." (*Id.* at ¶ 37, 38). He does state that Rosenthal and Selden mailed copies of documents in the Louisiana action to Weeks in Kansas, that Stolier made "several" though "not as frequent" phone calls to him in Kansas, and that Stolier faxed to him drafts of a proposed injunction against the Louisiana action. The attorneys agreed that Weeks would take the lead in preparing an emergency motion in Philadelphia, and Rosenthal and Gerard telephoned him several times to see how the motion was coming.

Weeks disputes the contentions of Selden, Stolier, Rosenthal and McCray that he did no work in representing French in Louisiana. According to Weeks, he was lead counsel for French in both Philadelphia and Louisiana, and he oversaw the attorneys' preparation for the November 6, 1996 fairness hearing in Louisiana. Rosenthal and Weeks agreed that French should personally appear at the hearing, and, toward this end, Weeks traveled to Missouri to assist in preparing his client. French then drove to Louisiana where he met with Rosenthal, Stolier, and McCray and testified at the hearing. Stolier subsequently mailed a transcript of the hearing to Weeks.

On October 18, 1996, Weeks filed a motion for temporary stay in the Third Circuit, which remanded the matter to the

district court. On October 24, 1996, the judge in the district court, Judge Yohn, called Fisher and asked him to set up a telephone conference with counsel for GM and the plaintiff class to discuss the motion for stay. Judge Yohn later notified French that he had contacted the judge presiding over the Louisiana action, Judge Marionneaux, and that Judge Marionneaux had agreed to withhold any decision until the matter was resolved before Judge Yohn.

On October 31, Fisher faxed to Gerard 32 pages of pleadings he and Weeks had prepared. Gerard had previously notified Fisher via fax that he was also presenting pleadings in connection with the requested stay. Fisher also called and obtained copies of pleadings in the Louisiana case. During November, Fisher and Gerard exchanged faxes of pleadings and court documents.

On November 19, Weeks traveled to Philadelphia, where he met with Rosenthal, Selden and Gerard. The attorneys argued that the district court should enjoin the Louisiana action. The district court denied the motion, and the French objectors filed an appeal. Fisher and Weeks also filed a motion for temporary stay in the Philadelphia action. At approximately the same time, and at the request of Gerard, they also sent various materials to David Chanin, Gerard's local counsel in Louisiana.

On December 19, 1996, Judge Marionneaux approved the coupon settlement in Louisiana. Rosenthal, Stolier, Selden, McCray and Weeks agreed to appeal the decision.

According to Weeks, Selden had "frequent" contact with him to discuss the Louisiana appeal, and, on June 23, 1997, Selden mailed a packet of research materials to Weeks on the issue of class actions in Louisiana. Weeks reviewed the material and had "extensive" phone conversations with Selden. Stolier also sent Weeks copies of pleadings in the Louisiana case. He also sent Weeks a copy of the appellate brief he (Stolier) submitted in Louisiana.

According to Fisher, he had "extensive and continuous" contact by mail, fax, and telephone with the defendants, which involved all aspects of the Philadelphia and Louisiana litigation. (Fisher Aff. at 2, ¶ 2).

On June 14, McCray twice tried to arrange by faxes sent to Weeks a conference call to prepare for upcoming arguments in the Third Circuit appeal. Conflicting schedules prevented this.

On July 24, French, Weeks, and Fisher traveled to Philadelphia. After a discussion of strategy with McCray, Stolier, Selden and Rosenthal, the group presented oral argument in the appeal the next day. Fisher had been asked to assist in the oral argument, and thus had applied for and gained admission to the Third Circuit. According to Fisher, after the argument, he and Weeks, McCray, Selden, Stolier, and Rosenthal agreed to continue to work together as a team.

In mid-August of 1997, Selden mailed Weeks a copy of GM's appellate brief in the Louisiana case, and, on October 28, 1997, Selden faxed Weeks a copy of a Ninth Circuit decision discussing class action principles. On October 29, Selden mailed a large envelope of legal materials to Weeks. The Louisiana Court of Appeals determined on September 9, 1997, that Judge Marionneaux had erred in transferring class action suits to himself. Selden faxed a copy of the decision to Weeks. On January 14, 1998, the Third Circuit ruled it did not have the power to enjoin the Louisiana action. *In re General Motors Corp. Products Liab. Litigation,* 134 F.3d 133 (3d Cir.1998). After this loss, Weeks wanted to strengthen the Louisiana appeal. On February 3, 1998, Selden faxed a draft of the proposed supplemental brief to Rosenthal, McCray and Stolier, with the request "review for input." (Weeks Exh.28) Weeks was copied on the letter. Weeks believed the brief should do more to stress the Supreme Court's decision in *Amchem Products v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). He prepared a proposed brief

which he sent along with a version on disk to Selden. The Weeks affidavit does not indicate whether his proposed brief was adopted in part or in whole.

On March 6, 1998, Selden sent a fax to Fisher which indicated that oral argument in *White v. GM* before the Louisiana Court of Appeals was scheduled for April 6. Selden addressed the memo to the "GM Team" which was shown as Rosenthal, McCray, Stolier, and Weeks.

In March of 1998, Selden contacted Weeks because he (along with McCray, Rosenthal, and Stolier) wanted French's consent to explore a possible global settlement. On March 19, Selden initiated a conference call with himself, French, and Weeks. Attorney fees were also discussed. Weeks told Selden he had spoken with French, and that French would not agree to any release unless all of his attorneys received reasonable compensation. The same day, Selden faxed Weeks and Fisher a copy of a letter proposing a settlement which had been sent by Louisiana class counsel, Mike Crow.

Selden again faxed Fisher a letter on March 19, addressed to Fisher and Weeks, stating that plaintiff class counsel had proposed a settlement. Stolier, Rosenthal, and McCray were copied on the letter. After describing the proposed settlement, Selden wrote:

> We understand you are in the best position to discuss this "offer" with Messrs. French, West, Merritt and Blades. Richard or I want to participate in those discussions as we are their Louisiana counsel. These discussions should be conducted immediately. We want the clients' authority to proceed with further settlement discussions, as well as their input into direction we should take, if feasible. No settlement will be agreed to without prior approval.
> Please advise.

(Fisher Exh.28).

The next day, Selden sent another fax to Weeks, which stated:

> Thank you for contacting the other clients, Messrs. Blades, West, and Mer-

ritt. They have given us authority to discuss settlement terms with our opponents with an eye to resolving all the GM litigation in which they were parties[.] They were advised we will not agree to any settlement without their explicit approval of the terms.

(Fisher Exh.29).

Selden drafted a letter to counsel for plaintiff class discussing the proposed settlement, faxing copies of the letter to Fisher on March 30 and 31. Selden also faxed to Fisher on March 30 a copy of a letter from Paul Traficante (a partner of Greco) stating that the Gerard/Greco group of objectors was willing to include their clients in the settlement negotiations.

On April 1, 1998, Selden faxed to Weeks a draft of a settlement letter which Stolier proposed sending to Crow. Weeks learned for the first time by this draft letter that defendant Jules LeBlanc—who had previously been representing other objectors—was working with Stolier, McCray, Rosenthal and Selden. Later in the day, Selden faxed a copy of the final version of Stolier's letter to Crow.

Weeks became concerned about the McCray group (McCray, Rosenthal, Selden and Stolier). He learned during conversations with Selden in 1998 that there were disagreements as to fee arrangements within the group. In addition, by this time Weeks had seen a *Wall Street Journal* article which discussed "professional" class objectors who object to proposed settlements in order to enhance their fees, and which named one of the members of the McCray group as an example.

After discussions with Weeks, Fisher wrote a letter to Traficante, Selden, Stolier, McCray, Rosenthal, and Gerard. The letter stated:

> Paul Weeks and I have been advised that there have been recent attempts to negotiate a settlement in this case. We have no objection to a settlement, so long as it is in the best interest of our

clients, the "French objectors." As we have stated before, any settlement must be realistic and of something more than a token for them and the class. Furthermore, any settlement must also take into account the substantial time, expense and energy that all counsel, both in Louisiana and the Third Circuit, have invested in this case. Furthermore, any distribution of the settlement must be fair to not only the clients, but to counsel.

Our clients, the "French objectors" have been involved in this case for several years and have always taken an active interest in the progress of this case. This is particularly true of Jack French. They have made it clear to Paul and me that they do not intend to consent to any proposed settlement until they are clearly informed of the proposed settlement and the effect it will have on the class, the objectors and counsel involved. Only after they have consulted with Paul and I will they then make a decision as to whether they agree with any particular proposal.

With this in mind, I want to make sure that Paul and I are advised of all settlement negotiations that are occurring or will occur with either plaintiff's class counsel or GM so our clients can be fully informed and we can advise our clients what we believe to be in their best interest. Along those lines, I would appreciate it if negotiating counsel would keep us fully informed of any negotiations. I will pass any information I receive along to Paul Weeks, so you do not need to contact him directly. (Fisher Exh.34).

The same day, Selden sent Fisher by fax a letter from Stolier which described the progress of the negotiations. According to Fisher, he had "numerous telephone calls, going both ways, with objectors' counsel, particularly defendants Gerard and Selden" about the negotiations. (Fisher Aff. at 13, ¶ 41). On May 7, Fisher wrote to Selden to find out how oral argument went in the Louisiana appeal. On May 13, Selden sent Fisher a copy of documents relat-ing to the negotiations. During June, Fisher and Weeks frequently spoke with Selden, who also sent copies of settlement correspondence to Fisher and Weeks in Kansas.

In June, the Louisiana Court of Appeals reversed the approval of the coupon settlement. *White v. General Motors Corp.*, 718 So.2d 480 (La.App.1998). Selden faxed a copy of the decision to Weeks.

Selden and McCray remained in contact with Fisher and Weeks during June. During these discussions, Fisher learned that certain objectors' counsel were making what he felt to be outrageous fee demands: that one wanted half of all the objector fees, while another wanted one-third. He learned that this inability to agree to the fees among the objectors—which included arguments over who did the most work, who had the most clout with the Louisiana judge, and who was the most deserving— was helping to thwart success in finalizing a settlement.

On July 8, Selden sent a copy of a letter by fax to Weeks and Fisher, which stated "I hope we can iron out our fee dispute soon. It is frustrating to let this negotiation opportunity expire because we are having trouble cutting up a pie that has yet to be cooked." (Fisher Exh.46).

Thus, by the summer of 1998, it was apparent that there would be a serious disagreement as to the fee between objectors' attorneys: the McCray group, the LeBlanc group, the Gerard/Greco group, and the Weeks/Fisher group. In July, McCray phoned Weeks and told him LeBlanc was demanding one-third of any fees. Weeks again spoke with Selden between June 15 and July 8, 1998. McCray phoned Weeks on July 13 or 14 to talk about the fee dispute, and asked Weeks to send him a summary of Weeks's work in Philadelphia and Louisiana. Weeks told McCray his efforts were so extensive that a summary would serve little purpose.

On July 15, McCray faxed Weeks and Fisher a proposed fee division. Under this

proposal, the attorneys would divide the settlement fees in the following manner:

| | |
|---|---|
| Gerard, Greco and Traficante | 20% |
| Weeks and Fisher | 20% |
| LeBlanc, Maples, and Waddell | 30% |
| Stolier, Rosenthal, Selden, and McCray | 30% |

McCray wrote:

> Jules LeBlanc has agreed to this formula, as have my direct colleagues. If you agree, then please sign and date below. If and when everyone agrees, I will get with [class counsel Tim] Crowley and see if we can wrap this up. If we can't agree, then everyone is on their own and LeBlanc and I will do what we have to do.
>
> I would expect that this can be agreed to or not by Monday, July 20. If I don't have the signatures of everyone by then, I will assume there will be no agreement.

(Weeks Exh.39). The memo provided signature and date lines for Gerard, Greco & Traficante, Weeks, Fisher, LeBlanc, Maples and Waddell, Sullivan, Stolier & Resor, Rosenthal, and McCray. McCray had signed his part of the memo, dated July 15, 1998.

Weeks and Fisher believed an equal division (25%) among the groups was fairer, but had agreed they would take 20%. Fisher tried to contact McCray, but was unable to get through to him. Since Fisher was preparing to take a family vacation, he and Weeks agreed that Weeks would communicate their acceptance to McCray. Fisher also signed the agreement and sent it back to McCray.

On July 16, McCray called Weeks and they talked about the proposed division. McCray told Weeks that if he and Fisher did not agree to the division, McCray and LeBlanc would take the dispute to a Louisiana judge who would be partial to LeBlanc. McCray said that the Gerard group had agreed to the division, and that therefore the Fisher/Weeks group was the only group not to accept the arrangement.

Weeks told McCray that he and Fisher would accept the division. McCray then said that he would take the lead in negoti-

ating on behalf of the objectors. Fisher and Weeks consented to this arrangement.

On July 21, 1998 McCray mailed to Weeks a copy of the July 15 proposed fee arrangement, re-dated for July 16. McCray wrote:

> This will confirm our telephone conversation this afternoon. In response to my fax of last night with recommendations for a resolution among us, you have told me that you are in agreement with the recommended fee split contained in my letter.
>
> You also have told me that I am authorized to settle the case along the lines that I suggested, but that your clients would have to provide final approval.

(Weeks Exh. 43). The "cc" line in the letter indicates it was sent to "All other objector counsel." None of the other objector counsel ever objected that McCray was acting outside the scope of his authority.

Weeks states in his affidavit that he believed the objectors' counsel had consummated a fee-splitting contract in Kansas.

At about this same time, McCray called Fisher, saying he was afraid of having "too many cooks" in the negotiations, and that he wanted to be in sole charge of the negotiations. (Fisher Aff. at 18–19, ¶ 51). Fisher agreed, but stated that the clients would still have to approve any final settlement.

On July 21, 1998, McCray wrote to Crowley—in a letter copied to "All objector counsel" including Fisher—stating that he had authority to negotiate for objectors:

> As I explained, I believe that I have the authority of all Objectors' Counsel to put together a settlement between Objectors, on the one hand, and Class Counsel and General Motors on the other. The specific groups to which I refer and represent are: (1) LeBlanc, Maples, and Waddell, (2) Bob Girard, Clyde Greco and Paul Traficante, (3) Paul Weeks and Randy–Fisher and (4) myself, Jack Stoli-

er, Lynde Selden, and Richard Rosenthal.

(Fisher Exh. 50).

Fisher wrote to McCray on September 21 to ask how the negotiations were going. Fisher wrote that he stood "willing to do anything that needs to be done to assist everyone in either getting this matter resolved or moved forward in the litigation process." (Fisher Exh. 51).

McCray responded the same day by a fax to Fisher describing the state of the negotiations, and assuring that he would inform all objectors' counsel "when the thing is signed." (Fisher Exh. 52).

On November 4, McCray sent by fax to Fisher a copy of McCray's letter to Crowley discussing various settlement proposals.

On November 16, Fisher wrote McCray to suggest that McCray inform class counsel they purported to represent the nationwide class, and that if they did not properly represent their clients, they could be replaced.

Shortly after this letter, McCray called Fisher twice. McCray stated that it was unlikely any settlement would obtain any recall of the trucks, and that the most they would probably obtain would be an amount to be placed in trust to research a safety fix or retrofit of the trucks. Fisher told McCray that if this was the best result which could be obtained, to enter into the settlement, subject to final approval by the clients. When Fisher asked McCray to forward any papers for signature to him and Weeks, McCray said he did not feel it was necessary to have the signatures of Fisher or Weeks on the final settlement papers, since they had not appeared in the Louisiana action as formal counsel of record. He also stated that class counsel was not fond of Weeks and Fisher because the French objectors had been a thorn in their side for years. Finally, McCray told Fisher that it was not important anyway, because they had already reached an agreement on the division of fees and the July agreement would protect everyone.

Fisher again spoke with McCray on December 10. McCray said he had arrived at a settlement, under which objectors' counsel would receive $3.75 million in fees, which would be divided according to the July agreement. McCray said the settlement would be approved by Judge Marionneaux in the near future.

Fisher then wrote to Stolier asking for copies of the settlement agreement, which he would use to get final approval from the clients. Stolier sent a copy of the documents on December 11, and Fisher subsequently spoke with Selden and McCray about the settlement. Following these conversations, Fisher wrote to Rosenthal on December 16:

> Based on my conversations with other counsel, it is my understanding you are the one who has been designated to send communications to the various clients in the objector class advising them of the terms and conditions of the most recent settlement.

> As part of that undertaking, we are required to not only advise the clients of the objectors' settlement, but we are also required under the terms of the Model Code to advise the clients of the fee sharing arrangement. DR 2-107. In conformity with that requirement, we need to send them a notice that the $3,750,000 objectors' attorney fee will be divided in accordance with our agreement of July 16, 1998, with Gerard, Greco and Traficante receiving 20% ($750,000), Weeks and Fisher receiving 20% ($750,000), LeBlanc, Maples and Waddell receiving 30% ($1,125,000) and Stolier, Rosenthal, Selden and McCray receiving 30% ($1,125,000). The clients also need to be advised that each party will bear there [sic] own costs and expenses from the amounts they receive for attorneys' fees.

> Please advise whether you have any problem in seeing that this disclosure is made to all objector clients. In the meantime, Paul and I intend to talk to our clients and fully inform them of the

terms and conditions of the proposed settlement and the objectors' fee sharing agreement.

(Fisher Exh. 57). Copies of the letter were sent to McCray, Selden, Greco, Le-Blanc, Stolier, and Gerard. On December 17, Greco wrote to Fisher that he believed the right to fees was conditioned on the Louisiana Court of Appeals decision. He did not register any other objection. Moreover, none of the objectors' counsel objected to the reference in Fisher's letter to "our agreement of July 16, 1998" to split fees.

On January 20, 1999, the Louisiana state court approved a settlement. The settlement included a requirement of a safety research trust fund. Fees in the amount of $3.75 million were to be paid to objectors' counsel in two installments.

Fisher heard about the settlement from another attorney in Kansas. He attempted to obtain information from objectors' counsel, but was unable to find anyone with a copy of the settlement. He wrote to class counsel on February 12 for a copy of the agreement. Shortly afterward, McCray called Fisher, and seemed upset. He was concerned that GM might appeal the award of objectors' fees, and was concerned there would be "too many cooks in the kitchen." (Fisher Aff. at 25, ¶ 63).

Eventually, GM's time to appeal the attorney fee award passed without an appeal. LeBlanc and Stolier sent copies of the settlement approval and judgment to Fisher and Weeks in Kansas. During and after this time, Fisher had several telephone conversations with objectors' counsel.

On March 15, 1999, McCray faxed a letter to Gerard, Greco, Traficante, Fisher and Weeks. The letter began by stating that "[l]ast summer we reached an agreement on the share of fees between us." The letter then stated that the McCray and LeBlanc groups would receive a "surcharge" based upon "the disproportionate amount of worked done" by Stolier, Rosenthal, McCray and LeBlanc. (Weeks Exh. 40).

Fisher wrote to McCray and requested the parties follow the July 16 agreement. No response was made to this request, and the present action was filed April 5, 1999.

On May 18, LeBlanc filed an interpleader action in Louisiana state court.

LeBlanc received the first installment ($2,119,565.22), which he distributed among objectors' counsel exactly as if the July agreement were in effect—with 30% going to the McCray group. Fisher and Weeks contend that the McCray July 15 letter formed the basis for a binding contract among counsel about the division of the fees.[1]

In support of the motion to dismiss, Rosenthal and Stolier averred in identical language that they "never communicated with any of the plaintiffs in Kansas via telephone, mail or otherwise." (Def. Exh. C. at ¶ 9). This statement is at least somewhat hyperbolic at best, and somewhat false at worst. In their reply, the defendants have attached affidavits which modify these earlier statements.

Stolier states that his records show nine telephone conversations with Weeks, and one telephone call with Fisher on June 30, 1998. Stolier also states that he sent three copies of correspondence to Weeks. He states that some of his conversations with Weeks may have occurred when Weeks was outside Kansas. He denies entering

---

1. In addition, Weeks and Fisher allege that the July 15 McCray letter created a Kansas contract which was to be performed under Kansas law. The court has been unable to determine any basis for this characterization of the agreement. Even assuming a contract existed, all the evidence cited by the plaintiffs shows is that some agreement existed to divide, among attorneys in Louisiana, California, and Kansas, fees arising from legal ac-

tions in Pennsylvania and Louisiana, for the representation of clients residing in Missouri and elsewhere. The court believes that Missouri (as the residence of the clients), Pennsylvania, or Louisiana (where the actions were prosecuted) could assert a much stronger interest in interpreting any such contract than Kansas (which is simply the residence of one set of the many attorney groups).

into any agreement with Weeks or Fisher for a division of fees, and states that he objected to the division proposed by McCray. He states that although "McCray was authorized to negotiate a proposed fee division on his behalf, he did not have my authority to nor did he bind me to the fee agreement." (Def. Exh. A, at ¶ 5).

In his affidavit, Rosenthal states that he has no recollection of speaking with Fisher in Kansas. He did communicate with French in Missouri, and met with Fisher in Philadelphia. Rosenthal acknowledges sending a letter to Weeks in Kansas, and states that Weeks "did call me from time to time," but states that Weeks was experiencing financial difficulties and had left Kansas, and thus believes he spoke with Weeks in Missouri "and possibly in other states," perhaps including Kansas. (Def. Exh. C, at ¶ 3). He states that he never discussed with Fisher or Weeks any division of fees.

According to Selden's affidavit, he does not deny having "communications with the plaintiffs: indeed, I had too many to deny," but denies that the communications provide a basis for jurisdiction. He avers that his group represented French in the Louisiana proceeding, while Fisher and Weeks represented him in Pennsylvania. He avers that Fisher and Weeks did not represent French in Louisiana. (Def. Exh. B., at ¶ 10). He acknowledges that the settlement in June of 1998 was endangered because the objectors' attorneys were involved in a fee dispute. He writes that after the decision of the Third Circuit, Fisher and Weeks "were reduced to cheerleaders on the sideline" and that they "commenced 'calling in plays', completely unsolicited, regarding tactics, strategy,

[and] settlement postures." (Id. at ¶ 9). He continues, stating that "They were a couple of jockeys who rode the wrong horse, who were trying to redeem their losses in the next race by betting on the winner." (Id. at ¶ 10).[2]

Which of the attorneys had the primary right to direct matters in the Louisiana litigation is in dispute. According to plaintiffs, French agreed to the representation of the McCray group in Louisiana only so long as Weeks acted as lead counsel. According to the members of the McCray group, Weeks and Fisher were only involved in the Philadelphia action, and did not represent French in *White v. GM* in Louisiana. Although the question must remain the matter of dispute, the court has carefully reviewed the plaintiffs' voluminous submissions of the correspondence between plaintiffs and defendants. Those documents provide no support for the characterization of the plaintiffs as playing a leading or controlling role in the Louisiana litigation—there does not appear to be any substantial documentary evidence which shows either (1) orders from Weeks or Fisher to the McCray group as to how to conduct the Louisiana action, or (2) from the McCray group to Weeks or Fisher asking for instructions on how to proceed. Rather, the overwhelming bulk of the documentary evidence of the correspondence among counsel is composed of photocopies of cited authorities and pleadings submitted by the sending party. That is, the defendants mailed to Fisher and Weeks complimentary copies of the materials relating to the Louisiana action. There is no documentary evidence any of the defendants asked at any time for the legal advice or direction of either Weeks or Fisher.[3]

---

2. The court notes that, in the argument portion of the defendants' reply, they urge the court to reject the affidavits of French, Fisher, and Weeks on the grounds that the affidavits consist of "rambling conclusions, unsubstantiated statements, hearsay, allegations of ultimate facts, opinions, arguments on the law and the merits of this case." (Reply at 2). To a certain extent, this criticism is fairly grounded, and, to that extent, the preceding

statement of the case has excluded such inadmissible evidence. It is hard, however, to see Selden's football and horse racing metaphors as any better.

3. In his affidavit, Weeks states that he was asked to "review for input" a draft supplemental brief in the Louisiana action, in a February 3, 1998 fax from Selden. (Weeks Aff. at ¶ 68). This misstates the role the docu-

### Conclusions of Law

The defendants have raised four arguments in support of their motion to dismiss: incomplete diversity, lack of personal jurisdiction, lack of venue, and forum non conveniens. The last two arguments appear dubious. Much of the defendants' venue argument depends upon an assumption, which the court does not accept, that the *contract claim by the plaintiffs is invalid*. As to the forum non conveniens argument, the court is inclined to believe that Kansas, centrally located in light of the California and Louisiana defendants and the prior truck litigation in Philadelphia and Louisiana, would provide a convenient forum for all the parties. It should also be noted that the defendants had no problem agreeing to represent clients engaged in nationwide class action litigation, and the defendants presumably have the resources to respond to the litigation here.

Ultimately, however, the court finds that it is unnecessary to resolve these issues.[4] The court finds that it is without jurisdiction to hear the matter since there is incomplete diversity among the parties— that the nominal defendants Greco and Gerard are for all intents and purposes essentially plaintiffs, and should be realigned as such.

■ Diversity jurisdiction does not exist under 28 U.S.C. § 1332 unless there is complete diversity among the parties.

Complete diversity requires that no plaintiff reside in the same state as one of the defendants.[5]

The Tenth Circuit has stated:

In diversity suits, courts will scrutinize the interests of the parties in order to determine if their positions as plaintiffs and defendants conform to their real interests. When appropriate, parties will be realigned; however, this is to be done only after real rather than apparent interests have been ascertained. 3A Moore's Federal Practice, 2nd ed., § 1093(1), at 2152. Facts which can be used for forming the determination that realignment is proper must have been in existence at the time the action was commenced. *See, Universal Underwriters Insurance Co. v. Wagner*, 367 F.2d 866 (8th Cir.1966); *Scott v. Fancher*, 369 F.2d 842 (5th Cir.1966); *Texas Pacific Coal & Oil Co. v. Mayfield*, 152 F.2d 956 (5th Cir.1946). An action is deemed to commence at the time of filing of the complaint. Accordingly, we must examine the pleadings to determine if there was a justiciable controversy.

*Farmers Alliance Mut. Ins. Co. v. Jones*, 570 F.2d 1384, 1387 (10th Cir.), *cert. denied*, 439 U.S. 826, 99 S.Ct. 97, 58 L.Ed.2d 119 (1978).

■ Realignment is a fact specific inquiry directed at "the realities of the record" to discover the "real interests" of the par-

---

ment gives to Weeks. The letter containing the request "review for input" was addressed explicitly only to Rosenthal, McCray and Stolier. Weeks received the letter only as "cc." (Weeks Exh. 28).

4. The court also reserves judgment on whether the exercise of personal jurisdiction over the defendants in Kansas is appropriate or consistent with due process.

5. The Supreme Court recently stated:

The Constitution provides, in Article III, § 2, that "[t]he judicial Power [of the United States] shall extend . . . to Controversies . . . between Citizens of different States." Commencing with the Judiciary Act of 1789, ch. 20, § 11, 1 Stat. 78, Congress has constantly authorized the federal courts to

exercise jurisdiction based on the diverse citizenship of parties. In *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), this Court construed the original Judiciary Act's diversity provision to require complete diversity of citizenship. *Id.*, at 267. We have adhered to that statutory interpretation ever since. *See Carden v. Arkoma Associates*, 494 U.S. 185, 187, 110 S.Ct. 1015, 1017, 108 L.Ed.2d 157 (1990). The current general-diversity statute, permitting federal district court jurisdiction over suits for more than $50,000 "between . . . citizens of different States," 28 U.S.C. § 1332(a), thus applies only to cases in which the citizenship of each plaintiff is diverse from the citizenship of each defendant.

*Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 67–68, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996).

ties. *Indianapolis v. Chase Nat'l Bank,* 314 U.S. 63, 69, 62 S.Ct. 15, 86 L.Ed. 47 (1941). In that decision, the Court wrote that

> Diversity jurisdiction cannot be conferred upon the federal courts by the parties' own determination of who are plaintiffs and who defendants. It is our duty, as it is that of the lower federal courts, to look beyond the pleadings and arrange the parties according to their sides in the dispute. Litigation is the pursuit of practical ends, not a game of chess. Whether the necessary collision of interest exists, is therefore not to be determined by mechanical rules. It must be ascertained from the principal purpose of the suit, and the primary and controlling matter in dispute.

*Id.* at 69, 62 S.Ct. 15 (citations and internal quotations omitted).

The purpose in realigning parties is to make sure that there is a bona fide controversy between, as the statute commands, citizens of different states. In applying the collision of interests test therefore we must be mindful that actual and substantial conflicts in fact existed at the initiation of the lawsuit. Hypothetical conflicts manufactured by skillful counsel must not control because such an approach would reintroduce the notion of gamesmanship so disparaged by the Supreme Court.

*Maryland Cas. Co. v. W.R. Grace & Co.,* 23 F.3d 617, 623 (2nd Cir.1993), *cert. denied,* 513 U.S. 1052, 115 S.Ct. 655, 130 L.Ed.2d 559 (1994).

■ In their response to the motion to dismiss, plaintiffs contend that Greco and Gerard have been appropriately named defendants since there is a possibility, should the court hold that no explicit fee division agreement existed, a dispute among them might exist as to apportioning fees. That is, according to plaintiffs, should the court rule the surcharge valid, there may be a dispute between the plaintiffs and Gerard–Greco as to how the surcharge should be apportioned among them. In support of their argument, Fisher and Weeks have cited several cases involving insurance company declaratory judgment actions, including what appears to be the leading and previously cited case of *Maryland Cas. Co. v. W.R. Grace & Co.,* 23 F.3d 617, 623 (2nd Cir.1993), *cert. denied,* 513 U.S. 1052, 115 S.Ct. 655, 130 L.Ed.2d 559 (1994).

The court finds that the insurance cases cited by the plaintiffs have little relevance here. In *Maryland Cas.,* an insurance company brought a declaratory judgment action against its insured and against other insurance companies. The Second Circuit concluded that the defendant insurers need not be realigned, even though all the insurers advanced an initial argument that no coverage was due. The court stated:

> The insurance companies never doubted that some among their number would be held liable on their policies to Grace. But with millions of dollars at stake, which of them must pay or how far back coverage would extend inevitably pitted each insurer against all the others.

23 F.3d at 623.

By their very nature, actions seeking to allocate responsibility for insurance companies set at issue the interests of different insurers. The present case simply does not involve parties (Fisher–Weeks versus Gerard–Greco) whose claims must, to use the language of *Maryland Cas.,* be "inevitably pitted" against each other. More importantly, if the court sets aside the arguments made in briefs to the court about what hypothetically might happen, and examine the positions taken by Greco and Gerard in their answer, a different picture emerges.[6] Of the 45 numbered

---

**6.** In *Farmers Alliance,* in which an insurer brought a declaratory judgment seeking to determine the scope of coverage arising from an automobile accident, the court took a similar approach. After noting that diversity must exist at the time of the commencement of the action, the court continued: "Accord-ingly, we must examine the pleadings to determine if there was a justiciable controversy." 570 F.2d at 1387. The court examined the complaint and answer, concluding that the "facts, as pleaded, reveal then that Farmers and Company recognized that their interests were adverse." *Id.* The court rejected the

paragraphs in the original complaint, Gerard and Greco admit to *each and every one of them.* They not only admit to each allegation, they frequently amplify on the original contention, stating for example that the surcharge was "unfair, unlawful, unauthorized and unjustifiable." (Dkt. No. 12, at ¶ 6). There is not the slightest suggestion in the answer that Gerard or Greco has any actual claim against Fisher or Weeks, or that they are going to actually assert any fall-back position about how to allocate the surcharge. Rather, *the only position taken in the answer is that the surcharge is illegal.* In the last paragraph of the answer, the defendants' prayer for relief requests that "the Court issue a decree that all parties be required to abide by the binding settlement agreement/contract to divide objector's counsel's fees in the percentages set forth in paragraph 27 of the complaint." (Id. at 4–5). No other relief is requested.

If the court looks at the position actually taken by the parties, it appears that Fisher, Weeks, Gerard, and Greco are unanimous in asking for the same, identical relief—striking the "surcharge" and enforcing the division of fees according to the July 15 McCray letter. Gerard and Greco are essentially plaintiffs, and will be realigned as such. When that is done, the action must be dismissed since some of the plaintiffs and some defendants are all citizens of the same state: California.

IT IS ACCORDINGLY ORDERED this 16th day of July, 1999 that the defendants' motion to dismiss (Dkt. No. 24) is hereby granted.

argument, based upon a statement of the insured disavowing the existence of a controversy over coverage, that a different result should apply. The statement occurred "in a deposition taken after the commencement of this action" and there was no "affirmative evidence indicating" the parties' statement of a controversy in their pleadings was collusive. *Id.* at 1387–88. As noted above, an examination of the complaint in the present action and the answer of Greco and Gerard fails to demonstrate the existence of any controversy about the facts presented or the relief requested.