In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 22-2905

CITY OF EAST ST. LOUIS, ILLINOIS,

*Plaintiff-Appellant,*

*v.*

NETFLIX, INC., *et al.,*

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:21-CV-561-MAB — **Mark A. Beatty**, *Magistrate Judge.*

_____

ARGUED SEPTEMBER 12, 2023 — DECIDED OCTOBER 13, 2023

_____

Before EASTERBROOK, HAMILTON, and PRYOR, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Illinois requires anyone who wants to provide cable or video service to obtain permission from state or local authorities, and pay a fee, as a condition of using public rights of way. 220 ILCS 5/21-101 to 5/21-1601. In recent years traditional cable services have been supplemented or replaced by over-the-top streaming services that

deliver their content through the Internet. The City of East St. Louis, Illinois, contending that all streaming depends on cables buried under streets or strung over them, filed this suit seeking to compel each streaming service to pay the City 5% of all revenues it receives. The City named Netflix, Disney, Apple, Hulu, Amazon, WarnerMedia, YouTube, Peacock TV, DIRECTV, DISH Network, CuriosityStream, and CBS Interactive as defendants in this suit. If the City is right, then The New York Times, CNN, Major League Baseball, and any other entity that transmits videos to paying customers likewise must pay fees to every municipality in Illinois.

Illinois initially required cable TV operators to obtain franchises from each city to be served, but after encountering administrative problems Illinois enacted the Cable and Video Competition Law (CVCL), which requires operators to obtain statewide authorization. Someone who has received authorization is called a "holder." 220 ILCS 5/21-201(k). None of the defendants has received permission from either the City or the state's Commerce Commission—which, from the City's perspective, is the nub of the problem, because paying a portion of the service's revenue to each municipality is a condition of receiving permission. The City asked the district court for a declaratory judgment whose practical effect would be to compel defendants to become "holders" and pay fees.

The parties agreed to decision by a magistrate judge. 28 U.S.C. §636(c). And the magistrate judge dismissed the complaint after concluding that only the Attorney General of Illinois is authorized to sue an entity that needs, but does not possess, "holder" status. 630 F. Supp. 3d 1003 (S.D. Ill. 2022). The magistrate judge observed that §21-1301 grants litigating power to the Attorney General. A proviso in §21-1301(a) "that

nothing in this Article shall deprive local units of government of the right to enforce applicable rights and obligations" refers to the preservation of existing contracts and local ordinances rather than a need for "holder" status, the judge thought. Other parts of the statute, such as §21-901(a), which grant some enforcement powers concerning audits to municipalities, do not deal with "holder" matters, which confirms the limits of §21-1301. Add to this the fact that not a single judge in Illinois has ever held that municipalities can sue to force anyone to become a "holder," and the magistrate judge's conclusion is hard to contest.

Before we can take up the merits, however, we must consider subject-matter jurisdiction. The City asserts jurisdiction under 28 U.S.C. §1332(a)(1) based on diversity of citizenship. As a rule, that means "complete diversity" under the approach laid down in *Strawbridge v. Curtiss*, 3 Cranch (7 U.S.) 267 (1806). Complete diversity exists only if none of the defendants has the same citizenship as any plaintiff. The City is a citizen of Illinois, see *Moor v. Alameda County*, 411 U.S. 693, 717–21 (1973), and it asserted that none of the defendants has Illinois citizenship. That assertion is mistaken. Several of the defendants are limited liability companies, and the citizenship of an LLC is the citizenship of each member—traced through as many levels as necessary until reaching a natural person or a corporation. See *Mutual Assignment & Indemnification Co. v. Lind-Waldock & Co.*, 364 F.3d 858, 861 (7th Cir. 2004). If you trace through the complex ownership structure of WarnerMedia Direct, LLC, on the date this suit began, you eventually reach AT&T Capital Services, Inc., which has its principal place of business in Illinois. Jurisdiction therefore cannot be sustained under 28 U.S.C. §1332(a)(1). (While this suit was pending, AT&T sold its stake in WarnerMedia Direct,

but jurisdiction depends on circumstances at a suit's outset. *Freeport-McMoRan Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991).)

Jurisdiction under §1332(d), a part of the Class Action Fairness Act (CAFA), remains a possibility. East St. Louis proposed to represent a class of all municipalities in Illinois, which number more than 100. The amount in controversy for all municipalities and all defendants comfortably exceeds $5 million. This led the City to rely on §1332(d)(2), which provides jurisdiction for such a class action if there is even minimal diversity—and of all defendants only WarnerMedia is a citizen of Illinois.

Neither the City, any of the defendants, nor the magistrate judge explored the significance of §1332(d)(4), which provides that a district court "shall" decline to exercise jurisdiction under §1332(d)(2) when more than two-thirds of the plaintiff class's members and at least one defendant are citizens of the state in which the suit was filed, and in addition the principal injuries occur there. Those conditions are met in this suit, so at oral argument we asked counsel why the case should not be dismissed. See *Mullen v. GLV, Inc.*, 37 F.4th 1326, 1328 (7th Cir. 2022) (court of appeals may raise problems under §1332(d)(4) on its own, even though (d)(4) does not negate the grant of jurisdiction in (d)(2)). As the significance of §1332(d)(4) had not been addressed in the briefs, we also invited supplemental filings.

After considering these post-argument memoranda, we conclude that §1332(d)(10) keeps this case in federal court. It reads: "For purposes of this subsection … an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose

laws it is organized." WarnerMedia Direct is unincorporated; only a corporation (or its equivalent in other legal systems) counts as incorporated, and every other kind of entity is treated as a partnership for jurisdictional purposes. See *Carden v. Arkoma Associates*, 494 U.S. 185 (1990); *Indiana Gas Co. v. Home Insurance Co.*, 141 F.3d 314 (7th Cir. 1998). As we observed earlier, normally the citizenship of any entity other than a corporation depends on the citizenship of its partners and members. But §1332(d)(10) tells us that, for the purpose of §1332(d), an unincorporated entity is treated like a corporation under §1332(c)(1): one citizenship for the state of its principal place of business, another for the state of its organization, and the investors' citizenship ignored. WarnerMedia Direct is organized under Delaware law and has its principal place of business in New York. This means that diversity is "complete" under the special definition applicable to §1332(d), and the condition for dismissal given in §1332(d)(4)(A)(i)(II)(cc) is not satisfied.

Today is the first time this circuit has considered how §1332(d)(10) works. As far as we can see, our understanding comports with that of every other circuit that has addressed the subject. See *BRT Management LLC v. Malden Storage LLC*, 68 F.4th 691, 696 n.7 (1st Cir. 2023); *Erie Insurance Exchange v. Erie Indemnity Co.*, 722 F.3d 154, 161 n.7 (3d Cir. 2013); *Ferrell v. Express Check Advance of SC LLC*, 591 F.3d 698, 699–700 (4th Cir. 2010); *Abrego Abrego v. Dow Chemical Co.*, 443 F.3d 676, 684 (9th Cir. 2006); *Siloam Springs Hotel, L.L.C. v. Century Surety Co.*, 781 F.3d 1233, 1237 n.1 (10th Cir. 2015). We therefore move to the merits.

Although the district court dismissed the City's claims under Illinois law because the statute does not provide it an

express right of action, we think it cleaner to reach the merits. The absence of a statutory right of action does not affect jurisdiction, and a judgment may be affirmed on any ground preserved in the district court, as this was, without the need for a cross-appeal. See *Massachusetts Mutual Life Insurance Co. v. Ludwig*, 426 U.S. 479 (1976). A decision on the merits will bring the dispute to a close.

The statutory system applies to any "cable service or video service". 220 ILCS 5/21-301(a). Defendants do not offer "cable service" (the City acknowledges this much), and "video service" is a term defined by §21-201(v):

> "Video service" means video programming and subscriber inter-action, if any, that is required for the selection or use of such video programming services, and that is provided through wireline facilities located at least in part in the public rights-of-way without regard to delivery technology, including Internet protocol technology. This definition does not include any video programming provided by a commercial mobile service provider defined in subsection (d) of 47 U.S.C. 332 or any video programming provided solely as part of, and via, service that enables users to access content, information, electronic mail, or other services offered over the public Internet.

This definition remains in force through the end of 2023. A new definition replaces it on January 1, 2024:

> "Video service" means video programming provided by a video service provider and subscriber interaction, if any, that is required for the selection or use of such video programming services, and that is provided through wireline facilities located at least in part in the public rights-of-way without regard to delivery technology, including Internet protocol technology. This definition does not include the following: (1) any video programming provided by a commercial mobile service provider defined in subsection (d) of 47 U.S.C. 332; (2) direct-to-home satellite services defined in subsection (v) of 47 U.S.C. 303; or (3) any video programming

> accessed via a service that enables users to access content, information, electronic mail, or other services offered over the Internet, including Internet streaming content.

Act of July 28, 2023, Pub. Act 103-0360. The City does not deny that the new definition excludes the defendants' streaming services. But it insists that it is entitled to damages through December 2023, while the original definition lasts.

It is hard to see a material difference between the two definitions. Exclusion (3) in the new definition just sharpens the language of the original definition, which excluded "any video programming provided solely as part of, and via, service that enables users to access content, information, electronic mail, or other services offered over the public Internet." The addition of "including Internet streaming content" makes pellucid what most readers of the older definition would have understood: content streamed over the Internet is outside the scope of this regulatory system. East St. Louis did not cite, and we could not find, any decision of any state court in Illinois holding that the original definition of "video service" includes over-the-top streaming services. No more need be said to resolve the parties' dispute about state statutory law.

The parties have debated what it means to "use" the public way for communication. Defendants insist that sending signals through wires owned and operated by other firms (firms that are themselves subject to state regulation) does not constitute a "use" of the public way. No one thinks, for example, that a conversation over a landline phone exposes the speaker and recipient to state regulation just because the phone system's wires cross public land. See *Chicago v. FCC*, 199 F.3d 424, 432–33 (7th Cir. 1999). We need not pursue this issue, however, given the clarity of the statutory definition.

"Use" remains potentially relevant to the City's assertion that the transmission is a "trespass" on the City's lands, in violation of the state's common law of property. Still, if phone calls over landline cables, electricity over wires, and gas routed through pipes are not trespasses on the City's land—and they are not—neither are the electrons that carry movies and other videos. Once again the City lacks any decision by any state court supporting its approach.

The City has one additional argument. East St. Louis Municipal Code §82-19 prohibits the "resale" of cable television service, which §82-20 defines:

> Cable television service means any and all services provided by or through the facilities of any cable television or closed-circuit coaxial cable communication system, or any microwave or similar transmission service used in connection with any cable television system or similar closed-circuit coaxial cable communication system.

This ordinance does not help the City. First, over-the-top streaming services do not "resell" cable TV service. An internet service provider sells the transmission of data (bandwidth) to and from arbitrary sources. Customers use that bandwidth to receive streaming videos from Netflix and similar providers. The internet service provider is paid for bandwidth; Netflix is paid for content; nothing is "resold." Second, internet service is not "cable television service" under the ordinance's definition. It is unrelated to "television." Although some internet service providers also offer cable TV service, the two services are priced and sold separately. An internet service provider may use coaxial cables or microwave relays for some of its data but does not employ a "closed-circuit" system. The Internet is as open as any circuit gets. It would take an exceedingly creative reading of the ordinance's

language to support the City's claims. Yet the City does not identify any helpful decision by any state court—and it is not an appropriate function of a federal court in a diversity suit to read a state or local statute in an unnatural way without the support of the state judiciary.

AFFIRMED